**CASE NOS. 25-6214 & 25-6470; 25-6223 & 25-6475; 25-6224 & 25-6465; 25-6229 & 25-6468**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff/Appellant/Cross-Appellee*,

v.

DEVONTE DEVON JACKSON, GIANN ICOB SALAZAR DEL REAL, JORGE ENRIQUEZ, JR., SHAMAR TYRELL GARCIA

*Defendants/Appellees/Cross-Appellants.*

Appeal from the United States District Court for the District of Nevada
Hon. David G. Campbell, J., Presiding (D. Ariz.)
District Court Case Nos. 2:25-cr-240, 2:25-cr-227, 3:25-cr-26, 2:25-cr-230

# BRIEF OF AMICUS CURIAE CATO INSTITUTE IN SUPPORT OF DEFENDANTS/APPELLEES/CROSS-APPELLANTS

Thomas A. Berry
*Counsel of Record*
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(443) 254-6330
tberry@cato.org

November 28, 2025

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. Amicus is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to the amicus's participation.

/s/ *Thomas A. Berry*
*Counsel for Amicus Curiae*
*Cato Institute*

Dated: November 28, 2025

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT....................................i

TABLE OF CONTENTS.......................................................................... iii

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF INTEREST OF *AMICUS CURIAE*..........................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..............................2

ARGUMENT .........................................................................................6

I. SIGAL CHATTAH WAS NOT VALIDLY APPOINTED ACTING U.S. ATTORNEY BECAUSE SHE DID NOT SERVE AS FIRST ASSISTANT UNDER A PERMANENT OR ACTING U.S. ATTORNEY. ..........................................................................................6

II. THE PURPORTED SUBDELEGATION OF ALL POWERS OF THE U.S. ATTORNEY TO CHATTAH VIOLATED THE EXCLUSIVITY PROVISION OF 5 U.S.C. § 3347. ................................................................12

CONCLUSION .......................................................................................19

CERTIFICATE OF COMPLIANCE ...........................................................20

CERTIFICATE OF SERVICE ...................................................................21

# TABLE OF AUTHORITIES

## Cases

*Doolin Sec. Sav. Bank, F.S.B. v. Off. of Thrift Supervision*, 139 F.3d 203 (D.C. Cir. 1998) .................... 6, 15

*NLRB v. SW Gen., Inc.*, 137 S. Ct. 929 (2017) .................... 2, 13

## Statutes

5 U.S.C. § 3345(a) .................... 4, 6, 17

5 U.S.C. § 3345(a)(1).................... 3

5 U.S.C. § 3345(a)(2).................... 3

5 U.S.C. § 3345(a)(3).................... 3

5 U.S.C. § 3346(a)(1).................... 10

5 U.S.C. § 3347 .................... 6

5 U.S.C. § 3347(b) .................... 16

## Other Authorities

144 Cong. Rec. S12,822 (daily ed. Oct. 21, 1998) .................... 6, 11, 12

144 Cong. Rec. S12,824 (Oct. 21, 1998).................... 14

FEDERAL VACANCIES REFORM ACT OF 1998, S. Rep. No. 105–250 (1998) .................... 3, 6, 10, 16, 17

MORTON ROSENBERG, CONG. RSCH. SERV., 98-892 A, THE NEW VACANCIES ACT: CONGRESS ACTS TO PROTECT THE SENATE'S CONFIRMATION PREROGATIVE (1998).................... 3, 12, 13

*Oversight of the Implementation of the Vacancies Act: Hearing on S. 1764 Before the S. Comm. on Governmental Affairs*, 105th Cong. (Mar. 18, 1998) .................... 13, 14, 18

## Constitutional Provisions

U.S. CONST. art. II, § 2, cl. 2 .................... 2

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and produces the annual Cato Supreme Court Review.

This case interests Cato because the government's interpretation of the FVRA would allow the executive branch to evade the limitations of the Vacancies Act at will. If the government's arguments were accepted, the executive branch would continue to fill vacant offices indefinitely with officials who have neither been appointed by the President nor confirmed by the Senate, which undercuts political accountability.

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in whole or in part. No person or entity other than amicus made a monetary contribution to its preparation or submission. Pursuant to Ninth Circuit Local Rule 29-2(a), all parties have been notified and have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Constitution requires, as a default rule, that officers of the United States must be nominated by the president and confirmed by the Senate. U.S. CONST. art. II, § 2, cl. 2. The Constitution allows only one potential exception to this default rule: if an officer is merely an "inferior officer," Congress may waive Senate consent. *Id.* But Congress is not required to choose this alternative: for many inferior offices, Congress has chosen to stick with the default rule and require Senate consent.

Obtaining Senate consent takes time. That means that when an office becomes vacant—especially when that vacancy is unexpected—the office can remain vacant for a lengthy period. For that reason, Congress has created a procedure for temporarily filling vacancies without Senate consent. This procedure has been implemented via a series of statutes known as Vacancies Acts, the first of which was enacted in 1792 and the most recent in 1998. *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 935–36 (2017) (recounting the history of these statutes).

Although these acts have varied in significant ways, they have mostly shared two key similarities. The first is a limitation on the length of time a person may serve as an unconfirmed acting officer. *See id.* (recounting how the maximum tenure of acting appointments was set at six months in 1795, shortened to 10 days in 1868, and then lengthened to 30 days in 1891, 120 days in 1988, and 210 days in 1998).

The second is a limitation on the pool of people who may be selected to serve as acting officers. *See* 5 U.S.C. § 3345(a)(1); (a)(2); (a)(3) (limiting the eligible pool of acting officers to three options: the "first assistant" to the vacant office; anyone serving in a Senate-confirmed position; or any federal employee who has served at least 90 days in a job at the top of the civil service payscale in the same department).

The restrictions on who can serve as an acting officer and how long they can serve are the core limitations that the Vacancies Act places on the executive branch. If the act did not place these limits, the executive branch would hardly ever chafe at following the procedures of the Vacancies Act. But if that were the case, the executive branch would also hardly ever have an incentive to nominate people for permanent positions rather than using the Vacancies Act. *See* FEDERAL VACANCIES REFORM ACT OF 1998, S. Rep. No. 105–250, at 7 (1998) ("If the purpose of the Vacancies Act is to limit the President's power to designate temporary officers, a position requiring Senate confirmation may not be held by a temporary appointment for as long as the President unilaterally decides."). Thus, Congress and the executive branch have, for decades, engaged in a tug-of-war, with Congress attempting to give the limitations real bite and the executive branch attempting to soften that bite. *See* MORTON ROSENBERG, CONG. RSCH. SERV., 98-892 A, THE NEW VACANCIES ACT: CONGRESS ACTS TO PROTECT THE SENATE'S CONFIRMATION PREROGATIVE 2–4 (1998) (recounting the history of disagreements between the executive branch and

Congress leading up to 1998). The Federal Vacancies Reform Act of 1998 (FVRA) represents the most recent skirmish in that tug-of-war.

The FVRA sets out the process for what happens when a Senate-confirmed officer leaves office: If there is a "first assistant" to the office, that first assistant becomes the acting officer, unless the President instead chooses a different eligible person (either Senate confirmed or GS-15) to be acting officer. 5 U.S.C. § 3345(a). This case raises two related questions about this procedure.

First, suppose there is no first assistant at the moment when the Senate-confirmed officer leaves office, but the President nonetheless declines to select any other eligible person to be the acting officer, resulting in there being no acting officer for a period of time. If someone later becomes the first assistant to the office while there is still no acting officer, does that person instantaneously become the acting officer?

And second, what happens when an *acting* officer (as opposed to a Senate-confirmed officer) leaves office? Does a new acting officer take office by exactly the same selection procedure as would have occurred if a Senate-confirmed officer had left office? Or does the selection process differ in some way compared to the process when a Senate-confirmed officer leaves office? Or more extreme, is there *no* way for one acting officer to succeed another under the FVRA, meaning that after one acting officer has departed, the office must simply remain vacant with no acting

officer (or at least no acting officer installed via the FVRA) until the Senate confirms a permanent officeholder?

For the reasons explained below, the answers to these two questions are: 1. No, a first assistant appointed when there is neither a Senate-confirmed nor an acting officer is not instantaneously elevated to be the acting officer, and 2. The process to be followed when an *acting* officer departs is exactly the same as the process to be followed when a Senate-confirmed officer departs. The upshot is that the district court was correct in its judgment that Sigal Chattah was not legitimately installed as acting U.S. attorney by means of her appointment as the first assistant to that position. But the district court's reasoning was too broad. The district court held that no one appointed first assistant at any point after a *Senate-confirmed* officer departs can be elevated to acting officer. But because the procedure for selecting a new acting officer is the same when an *acting* officer departs, someone could become acting officer if they took office as the first assistant during the tenure of an *acting* officer and that *acting* officer subsequently departed. However, this distinction is of no help to Chattah, because she became first assistant when there was neither a Senate-confirmed *nor* an acting U.S. attorney in place (she herself had to resign as acting U.S. attorney before she could be appointed first assistant).

Finally, the district court was correct that the government's alternative argument based on the sub-delegation of authority to Chattah cannot stand. Although

the sub-delegation of a non-exclusive duty is not categorically banned, a single person may not be delegated *all* the powers of a single vacant office. 5 U.S.C. § 3347.

## ARGUMENT

### I. SIGAL CHATTAH WAS NOT VALIDLY APPOINTED ACTING U.S. ATTORNEY BECAUSE SHE DID NOT SERVE AS FIRST ASSISTANT UNDER A PERMANENT OR ACTING U.S. ATTORNEY.

The FVRA limits eligibility to acting officers to only three categories: First assistants, Senate confirmed officers, and those who served at the GS-15 level in the same department for at least 90 days prior to the vacancy. 5 U.S.C. § 3345(a). Congress thought these limitations would matter. Indeed, the addition of the third category (GS-15s) was itself a compromise to help get the FVRA passed. The previous version of the Vacancies Act had only the first two categories of eligibility. *See Doolin Sec. Sav. Bank, F.S.B. v. Off. of Thrift Supervision*, 139 F.3d 203, 206–07 (D.C. Cir. 1998) (quoting prior version of the Vacancies Act in full). So did the version of the FVRA passed out of committee. *See* FEDERAL VACANCIES REFORM ACT OF 1998, S. Rep. No. 105–250, at 1–2. But the third category was added before the FVRA became law, because "Concerns had been raised that, particularly early in a presidential administration, there will sometimes be vacancies in first assistant positions, and that there will not be a large number of Senate-confirmed officers in

the government." 144 Cong. Rec. S12,822 (daily ed. Oct. 21, 1998) (Sen. Thompson).

Congress would not have cared so much about the number of people eligible to be acting officers unless these categories were expected to meaningfully constrain the choice of eligible acting officers. That is why the maneuver used by the executive branch in this case intuitively goes against the spirit of the FVRA: appointing a first assistant when the position is vacant and instantaneously elevating that first assistant to be the acting officer. When there are no constraints on who can be a position's first assistant, the executive branch could fill the role with whomever they wish and instantaneously elevate that first assistant to be the acting officer. When that maneuver is available, the limitations on acting officers in the text of the FVRA offer no meaningful constraints.

The question is, does this maneuver violate not only the *spirit* of the FVRA, but also its *text*? The district court held that subsection (a)(1) functions as a trigger, at a specific moment in time, and only elevates the first assistant who is *already* serving as the first assistant at that moment (if there is one).

That interpretation is sound, and it fits with the structure of the FVRA. For one thing, all three categories limit acting service to those who already hold some position in the federal government, and who thus (hopefully) possess some relevant experience that would qualify them to serve as acting officers. But if subsection

(a)(1) operates as the government argues, then it does not actually require any amount of time served as a first assistant. A person can be named first assistant and then be elevated to be acting officer a millisecond later. Requiring that someone served as the first assistant *under* some other Senate-confirmed or acting officer guarantees that the first assistant actually did serve as such for some amount of time.

The point of subsection (a)(1) is to automatically gap-fill offices as often as possible when the president may not have the time or attention to make an immediate selection under (a)(2) or (a)(3), and to gap-fill with a person likely to have some relevant experience. Neither of these purposes are served if there can be some period of time between the moment when the position has no Senate-confirmed or acting officer and the moment when a first assistant is selected (and instantaneously elevated to acting officer). In that scenario, some action from the administration was necessary before the acting officer took office (the selection of a new first assistant), so no gap-filling purpose is served. The position could have been filled just as quickly via subsections (a)(2) or (a)(3). And the new first assistant would not have spent any meaningful time in the role, so the purpose behind making that position uniquely eligible to serve as acting officer even when its occupant would neither qualify under (a)(2) nor (a)(3) is not served.

But the district court's interpretation that (a)(1) is only triggered when the *Senate-confirmed* officer leaves office (and not also when an *acting* officer leaves

office) would prove too much. It would potentially mean that (a)(2) and (a)(3) are *also* unavailable when an acting officer leaves office. That is because subsections (a)(1), (a)(2), and (a)(3) are all subordinate to section (a). If the district court were right that (a)(1) is only triggered at the time of a Senate-confirmed official's departure, then (a)(2) and (a)(3) would similarly be available only for one-time use. There is no textual reason why the order of operations would loop back to (a)(2) but not all the way back to (a)(1). In other words, (a)(2) and (a)(3) are no less textually tied to (a) than (a)(1). Both (a)(2) and (a)(3) are also described as one-time choices (the president "may direct *a* person" or "may direct *an* officer or employee").

The question is, if an *acting* officer dies or resigns, does the order of operations loop back to (a)(1), or instead is there no ability to appoint a new acting officer during the remaining pendency of the vacancy? To be sure, the text describes the procedure as occurring when a person in an office requiring Senate confirmation departs. *See* 5 U.S.C. § 3345(a) ("an officer . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate"). Although this is most naturally read as referring only to the departure of people who were themselves Senate-confirmed, this could also be read to refer to the departure of acting officers *filling* such offices that require Senate consent. And this reading would far better fit the structure and purpose of the FVRA.

There is strong evidence that the FVRA was drafted with the possibility of multiple successive acting officers in mind. Indeed, the time limit was adjusted so that it begins running at the moment the Senate-confirmed officer departs, thus allowing successive acting officers *without* resetting the time limit and giving the executive branch an advantage. 5 U.S.C. § 3346(a)(1).

And there is clear evidence of this purpose in the Senate Report. The Senate Report says "An *acting* officer may die or resign. *In that event*, the first assistant, *if there is one*, or a new presidential designee of a Senate-confirmed officer may become the acting officer, limited in service as acting officer to 150 days less the time of service of the first acting officer." S. Rep. No. 105–250, at 14. It is hard to read this sentence as anything other than an expectation that (a)(1) would be *retriggered* at the departure of any acting officer.

The government relies heavily on the fact that the FVRA changed the language defining the first assistant from "first assistant to the officer" to "first assistant to the office of such officer." The government argues that this change supports its *post-hoc* acting officer theory of eligibility. But under the reading that allows one acting officer to succeed another, it makes perfect sense why Congress changed this language. The first time around, when the Senate-confirmed officer herself leaves office, the eligible first assistant (if any) would be the first assistant to that officer herself. But the *second* time around, if an *acting* officer dies or resigns,

the first assistant (if any) would only be the first assistant to the *office*, not the first assistant to the long-departed Senate-confirmed officer. And this reading is bolstered by the fact that it is *exactly* the reason given by the lead sponsor of the majority party on the Senate floor explaining why this change was made. As Senator Fred Thompson explained, "The term 'first assistant to the office' is incorporated into 5 U.S.C. § 3345(a)(1), rather than 'first assistant to the officer.' This change is made to 'depersonalize' the first assistant. *Questions have arisen concerning who might be the vacant officer's first assistant if the acting officer dies or if the acting officer resigns* while a permanent nomination is pending." 144 Cong. Rec. S12,822 (daily ed. Oct. 21, 1998) (Sen. Thompson) (emphasis added).

Finally, the government would not be hamstrung by a limiting interpretation of subsection (a)(1) at the beginning of presidential terms. To be sure, it is likely that few Senate-confirmed officials will remain in government immediately after a presidential transition. But this is *exactly* the concern that led to the late addition of subsection (a)(3) to the FVRA, expanding eligibility to long-serving career civil servants. This third category was added before the FVRA became law, because "Concerns had been raised that, particularly early in a presidential administration, there will sometimes be vacancies in first assistant positions, and that there will not be a large number of Senate-confirmed officers in the government." 144 Cong. Rec. S12,822 (daily ed. Oct. 21, 1998) (Sen. Thompson). There are no shortage of GS-

15s available to serve as acting officers at the beginning of an administration. Their availability means that the government's expansive view of subsection (a)(1) is not necessary to keep the government functioning after a presidential transition.

## II. THE PURPORTED SUBDELEGATION OF ALL POWERS OF THE U.S. ATTORNEY TO CHATTAH VIOLATED THE EXCLUSIVITY PROVISION OF 5 U.S.C. § 3347.

Congress's primary motivation for reforming the Vacancies Act in 1998 was to foreclose the ability of agencies to make delegations in evasion of the Act, delegations just like the one the government purported to make to Chattah in this case as a last-ditch attempt to save her authority. In the 1970s, the Department of Justice (DOJ) began arguing "that the Vacancies Act only 'provides one [possible] method for filling certain positions on an interim basis', and that some departments and agencies, including DOJ, 'have statutory authority to assign duties and powers of positions on a temporary basis outside the Vacancies Act.'" ROSENBERG, *supra*, at 2–3. DOJ argued that it had such authority under the department's organizational statutes, which vested all functions and duties of the department in the attorney general and allowed the attorney general to delegate those functions to other department officials. *Id.* at 3.

Making similar arguments based on their own organizational statutes, "the Departments of Health and Human Services (HHS), Education, and Labor . . . adopted the same rationale with respect to administrative provisions in their own

enabling legislation." *Id.* Using this theory, dozens of people served as acting officers across the executive branch for longer than the Vacancies Act's time limits allowed, performing all the delegable functions and duties of vacant offices without any of the Vacancies Act's restrictions. *Id.* at 4.

Based on this delegation theory, President Bill Clinton appointed Bill Lann Lee as acting assistant attorney general for civil rights in December 1997. *Id.* at 1. Lee's service began after the Vacancies Act's time limit for filling the vacant position had already expired, and his appointment was the final straw for Congress. *Id.* Lee's designation was particularly galling to some senators because it came "immediately after the Senate refused to confirm him for that very office." *SW Gen., Inc.*, 137 S. Ct. at 936. A group of senators would soon set to work to reform the Vacancies Act and prevent similar designations in the future.

These efforts began with a March 1998 hearing on reforming the Vacancies Act. The use of delegation statutes to evade the limitations of the Vacancies Act was the subject of committee chairman Fred Thompson's entire opening remarks. *See Oversight of the Implementation of the Vacancies Act: Hearing on S. 1764 Before the S. Comm. on Governmental Affairs*, 105th Cong. 1–5 (Mar. 18, 1998) [hereinafter *Senate Hearing*][2] (noting that Lee could "serve indefinitely according

[2] Available *at* https://bit.ly/3G8kS3w.

to the Justice Department's theory" and that "this is clearly not what the Congress envisioned").

The initial and primary goal of Vacancies Act reform was to reject the argument "that these broad housekeeping provisions somehow override or are in the Department's words, 'independent of and not subject to,' the more specific provisions of the Vacancies Act." *Id.* at 12 (Sen. Byrd). As another member of the committee put it, "We can cure the Vacancies Act loophole that [DOJ has] divined, and I hope we do, one way or another and do it real tight." *Id.* at 22 (Sen. Levin). And as the ranking member of the committee said directly to a DOJ lawyer testifying at the hearing, "You have been able to interpret [the Vacancies Act] in a way that lets you go ahead and do things that were never intended . . . . So I think we have to go ahead with this, and I want to make sure that this time we do make it airtight." *Id.* at 35 (Sen. Glenn).[3]

To this end, Congress made crucial changes to the "exclusivity" provision of the Vacancies Act. Prior to the FVRA's enactment in 1998, this provision read, in full: "A temporary appointment, designation, or assignment of one officer to perform

[3] This goal remained the primary motivating factor for Vacancies Act Reform through the entirety of the process. *See* 144 Cong. Rec. S12,824 (Oct. 21, 1998) (Sen. Byrd) ("[T]he matter of exclusivity is the bedrock point on which the executive and legislative branches have historically differed. Indeed, it is very likely that we would not be here today were it not for the differing interpretations as to the exclusivity of the Vacancies Act.").

the duties of another under section 3345 or 3346 of this title may not be made otherwise than as provided by those sections, except to fill a vacancy occurring during a recess of the Senate." *See Doolin Sec. Sav. Bank, F.S.B.*, 139 F.3d at 206–07 (quoting prior version of the Vacancies Act in full). While this language made clear that an acting appointment *under the Vacancies Act* must strictly comply with the Vacancies Act's own limitations (such as its time limits and qualification requirements), it arguably left open the question whether *other statutes*, such as the general vesting and delegation statutes for each department, could be used to appoint acting officers.

The FVRA's new exclusivity provision, found in Section 3347, goes much further. It mandates that no other statute may be used by the executive branch to temporarily fill a vacancy in an office normally requiring presidential appointment and Senate consent (a "PAS" office) unless that statute includes an express statement making clear that it can indeed be used to designate acting officers.

Further emphasizing this clear statement rule of construction, subsection 3347(b) next provides an example of a type of statute that does *not* satisfy subsection 3347(a)'s clear statement rule. Not coincidentally, the example used was the very type of statute at issue in the controversies that led to the FVRA's passage. This exemplary subsection explains that: "Any statutory provision providing general authority to the head of an Executive agency . . . to delegate duties statutorily vested

in that agency head to, or to reassign duties among, officers or employees of such Executive agency, is not a statutory provision to which subsection (a)(2) applies." 5 U.S.C. § 3347(b).

The text of Section 3347, the new exclusivity provision, thus sets out a rule that, in some circumstances, invalidates delegations even when those delegations would otherwise be authorized by law. Specifically, a delegation is invalid if (1) it "temporarily authoriz[es] an acting official to perform the functions and duties of" a PAS office *and* (2) the statute providing the purported authority to make the delegation does not expressly authorize the President, a court, or the head of an executive department "to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity."

With this language, Congress achieved its goal of enacting a law that forbids the executive branch from using delegation to evade the Vacancies Act. As the statement of purpose in the FVRA Senate Report described it, the purpose of the FVRA was "to create a clear *and exclusive* process to govern the performance of duties of offices in the Executive Branch" during vacancies. S. Rep. No. 105-250, at 1 (emphasis added). And as emphasized by the example provided in subsection 3347(b), "Statutes that generally permit agency heads to delegate or reassign duties within their agencies are specified not to constitute statutes that provide for the temporary filling of particular offices." *Id.* at 2.

It will usually be clear when a statute lacks a clear statement expressly authorizing acting appointments.[4] The only part of Section 3347's test that may require some interpretation in particular cases will thus usually be the first one, the question whether a delegation has "temporarily authoriz[ed] an acting official to perform the functions and duties of" an office. But applying this test is straightforward, because this language is found repeatedly throughout the FVRA—it is precisely what Section 3345 of the FVRA permits the President to do *in certain circumstances*. Section 3345 lays out the various scenarios in which the President may authorize an official "to perform the functions and duties of the vacant office temporarily in an acting capacity." 5 § U.S.C. 3345(a). Thus, a delegation that violates the exclusivity provision of the FVRA is simply a delegation that purports to accomplish the equivalent of an acting appointment made *pursuant* to the Vacancies Act.

An appointment made *pursuant to* the Vacancies Act is an appointment that temporarily grants all the authority of a vacant office to a single acting officer. Thus, a delegation is illegal if it (1) grants all the authority (2) of a vacant PAS office (3) to a single person. It is no defense to say that all the delegated powers are *normally*

[4] The Senate Report identified several statutes that *did* contain such an express statement, none of which were delegation statutes. S. Rep. No. 105-250at 15–17.

delegable, because the exclusivity provision of the FVRA partially supersedes and limits the reach of any delegation statute *in this specific circumstance*.[5]

Nor does it make a difference if an agency claims it is only delegating the *delegable* duties of an office, absent proof that there is some function of the office that is in fact not delegable and has in fact not been delegated. To avoid violating the exclusivity provision, a delegation must identify specific duties of the office that have *not* been delegated, so that the delegation clearly does *not* bestow an authority equivalent to an appointment under the Vacancies Act. A delegation that purported to grant Chattah all the same authorities of a U.S. attorney would thus violate Section 3347.

[5] At the March 1998 Senate hearing, a DOJ attorney defended the legality of the delegation strategy by arguing that "The assistant attorney general in charge of the Civil Rights Division . . . exercises only the power that the Attorney General chooses to give him. It would be anomalous, indeed, if the occurrence of a vacancy lessened her authority to assign duties in the way that best promotes the efficiency of the Department." *Senate Hearing* at 27 (DOJ attorney Daniel Koffsky). But Congress in the FVRA made the clear judgment that it is *not* anomalous to reduce an agency's delegation authorities during a vacancy, because doing so is the only way to ensure that the limitations of the Vacancies Act are followed. In other words, Congress was aware of the argument that foreclosing the delegation strategy would require partially superseding and limiting otherwise applicable delegation authorities, and Congress chose to do exactly that.

## CONCLUSION

The judgment of the district court that Chattah was invalidly appointed and not validly subdelegated the powers of a U.S. attorney should be affirmed.

Respectfully submitted,

Thomas A. Berry
*Counsel of Record*
CATO INSTITUTE
1000 Massachusetts Ave., N.W.
Washington, DC 20001
(443) 254-6330
tberry@cato.org

Dated: November 28, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of 9th Cir. R. 29(a)(2) because it contains 4,547 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Times New Roman, 14-point font.

/s/ *Thomas A. Berry*
*Counsel for Amicus Curiae*
*Cato Institute*

Dated: November 28, 2025

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court, who will enter it into the ACMS system, which will send a notification of such filing to the appropriate counsel.

/s/ *Thomas A. Berry*
*Counsel for Amicus Curiae*
*Cato Institute*

Dated: November 28, 2025